J-S25045-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE INTEREST OF: K.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: C.S. | : | |
| | : | No. 140 WDA 2018 |

Appeal from the Order October 10, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000041-2017

| IN THE INTEREST OF: B.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: C.S. | : | |
| | : | No. 141 WDA 2018 |

Appeal from the Order October 10, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000042-2017

| IN THE INTEREST OF: S.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: C.S. | : | |
| | : | No. 142 WDA 2018 |

Appeal from the Order Entered October 10, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000043-2017

BEFORE: GANTMAN, P.J., PANELLA, J., and OTT, J.

MEMORANDUM BY OTT, J.:                           FILED JULY 09, 2018

C.S. ("Mother") appeals from the October 10, 2017 orders in the Court of Common Pleas of Allegheny County involuntarily terminating her parental rights to her three daughters, K.L., born in March of 2010; B.L., born in February of 2012; and S.L., born in March of 2014 (collectively, "the Children").[1]  Upon careful review, we affirm.

The factual and procedural history relevant to this appeal are as follows. On November 2, 2015, the Allegheny County Office of Children, Youth, and Families ("CYF") received a report that Mother had a drug problem and had relocated with the Children from the State of Indiana to the home of her cousin in Pennsylvania to escape domestic abuse she suffered from Father.  N.T., 10/10/17, at 9.  In March of 2016, Mother became homeless, and she and the Children went to a shelter in Allegheny County.  Id.  On March 17, 2016, Mother had suicidal ideations, and she was placed in a mental health institute. Id.  CYF obtained protective custody of the Children on March 18, 2016, and placed them with their current foster parents, a pre-adoptive resource.  Id. at 8, 22-23.

At the time of placement, K.L. was six years old, and she was not in school.  Id. at 52.  She needed extensive dental work, and the dental needs of B.L., four years old, and S.L., nearly two years old, had also been neglected.

_____

[1] By the same orders, the orphans' court involuntarily terminated the parental rights of the Children's father, C.L. ("Father").  Father filed notices of appeal from the orders, which this Court affirmed.  See In re S.L., B.L., K.L., ___ A.3d ___, 2018 Pa. Super. Unpub. LEXIS 1188 (filed April 16, 2018).

- 2 -

Id. In addition, with respect to S.L., the CYF caseworker agreed there was concern that she was failing to thrive at the time of placement. Id.

The court adjudicated the Children dependent on April 13, 2016. Id. In furtherance of the Children's permanency goal of reunification, the court ordered family service plan ("FSP") goals for Mother to address her history of domestic violence, drug and alcohol abuse, mental health, and homelessness. Id. at 10. In addition, the court ordered Mother to maintain contact with CYF and to participate in supervised visits with the Children. Id. Mother did not satisfy her FSP goals. Id. at 11-18.

On March 20, 2017, CYF filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). An evidentiary hearing occurred on October 10, 2017, when K.L. was seven years old, B.L. was five years old, and S.L. was three years old. CYF presented the testimony of its caseworker, Erin Frawley; Heather DiBenedtto, the caseworker from Adoption Connection foster care agency; and Neil D. Rosenblum, Ph.D., who performed an interactional evaluation of the Children, their parents, and their foster parents, and he performed individual evaluations of the Children and Mother. Mother did not attend the hearing; however, she was represented by counsel.

Andrea Spurr, Esquire, represented the Children's legal interests during the hearing.[2] Attorney Spurr stated on the record in open court that no conflict exists between the Children's legal and best interests.[3] Id. at 59-60. Attorney Spurr cross-examined all of CYF's witnesses, and she advocated on behalf of the Children's legal interests.[4]

On October 10, 2017, the orphans' court granted CYF's petitions for the involuntary termination of Mother's parental rights. On November 1, 2017,

_____

[2] In In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017) (plurality) our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. The L.B.M. Court did not overrule this Court's holding in In re K.M., 53 A.3d 781 (Pa. Super. 2012), that a guardian ad litem who is an attorney may act as counsel pursuant to Section 2313(a) as long as the dual roles do not create a conflict between the child's legal and best interests.

[3] We must raise sua sponte whether the Children were denied legal counsel during the involuntary termination proceeding pursuant to Section 2313(a) of the Adoption Act. See In re Adoption of T.M.L.M., ___ A.3d ___, 2018 PA Super 87, *4 (Pa. Super. April 13, 2018) (citing In re K.J.H., 180 A.3d 411, 414 (Pa. Super. 2017) (Judge Olson dissenting)).

In this case, the testimonial evidence, discussed infra, demonstrates that K.L. and B.L. stated their preferences to be adopted by their pre-adoptive foster parents. The youngest child, S.L., was three years old at the time of the termination proceedings and, therefore, not capable of articulating her preference in this regard. As such, no conflict exists between S.L.'s legal and best interests. Accordingly, we conclude that the Children were not denied legal counsel in this case.

[4] Attorney Spurr filed an appellee brief, wherein she argued in support of the involuntary termination orders.

- 4 -

Mother filed notices of appeal and concise statements of errors complained of on appeal, which this Court consolidated sua sponte.

On appeal, Mother questions whether the orphans' court abused its discretion and/or erred as a matter of law "in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hildren pursuant to 23 Pa.C.S. § 2511(b)?" Mother's brief at 10.

We review Mother's issue according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the orphans' court involuntarily terminated Mother's parental rights pursuant to the following provisions of the Act:

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

Mother does not raise an issue with respect to Section 2511(a). Therefore, we review the orders with respect to Section 2511(b) only. This section requires that trial courts "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, we have explained:

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of

- 7 -

relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re A.S., 11 A.3d 473, 483 (Pa. Super. 2010). In considering the affection that a child may have for his or her natural parents, this Court has stated:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

In addition, we are mindful of our Supreme Court's directive in In re T.S.M., supra, that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." Id. at 268. The Court stated that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." Id. at 269. The T.S.M. Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy

development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." Id.

Mother argues on appeal that the evidence established that she has a "loving and affectionate" relationship with the Children, and that it is "positive and beneficial" for the Children. Mother's brief at 15. Mother contends that Dr. Rosenblum's testimony does not support terminating her parental rights to the older children, K.L. and B.L., pursuant to Section 2511(b). Finally, Mother asserts that the court, in terminating her parental rights,

> relies significantly upon the hope or expectation that the foster parents will allow Mother to have ongoing contact with her children. Such post-adoption contact however cannot be assured if Mother's parental rights are terminated. This inability to assure [sic] contact between Mother and [the Children] prevents a finding that the termination of Mother's parental rights clearly and convincingly serves the needs and welfare of [the Children].

Mother's brief at 15-16. We disagree.

The record reveals that, throughout the history of this case, Mother has inconsistently attended supervised visits with the Children. N.T., 10/10/17, at 55. As best we can discern, Mother only attended two scheduled supervised visits, both of which occurred in March of 2017. Id. at 16, 102. On a date unspecified in the record, Mother returned to the State of Indiana and resided with Father. Id. at 15. However, Mother communicates with the Children via telephone and Skype at scheduled times approximately twice per week. Id. at 69-70.

Heather DiBenedtto, the foster care agency caseworker who visits the Children in the foster home, testified that K.L. started receiving therapy in January of 2017, when she was six years old, "because she was very frustrated with mom moving to Indiana." Id. at 69, 72. She testified that K.L. "specifically told me in one of the home visits that she doesn't understand why mommy doesn't want to visit them anymore and why she moved back to Indiana." Id. Ms. DiBenedetto testified that K.L. receives therapy once per week, and she is making progress. Id. at 68-69.

Ms. DiBenedetto testified that the Children "had typical issues of adjusting to foster care. At first they missed their mom especially. . . . [T]hey talked about missing their birth mom and they were excited for visits with her." Id. at 66. However, she testified that the Children now "don't talk about their birth parents unless I ask them. [B.L.] has actually asked if she could stay, has specifically requested to stay with the foster family, and [K.L.] will say she wants to stay if she's asked. She wouldn't say that unless she's asked to." Id.

Ms. DiBenedetto testified that the Children "are now calling [their foster parents] mommy and daddy. It took a while to get to that point. [S.L.] called them mommy and daddy for several months now. [B.L.] and [K.L.] started consistently calling them mommy and daddy in June or July [of 2017]. Foster mom said that they did that on their own." Id. at 66-67.

Ms. DiBenedetto testified that the older children, K.L. and B.L., then age seven and five, have an appropriate understanding of adoption, and that they wish to be adopted. Id. at 80. She stated that B.L. "has been saying that way longer than K.L. has." Id. In September of 2017, K.L. told her "she would like to be adopted at this point." Id.

Erin Frawley, the CYF caseworker who also visits the Children in their foster home, testified that the Children "seem very comfortable" there. Id. at 22. She continued:

> I have seen the kids interact with the foster parents. They seem very bonded to the foster parents. They refer to them as mom and dad. They go to them for their needs. If they need help with something, if they want something, they turn to the foster parents. They are very comfortable doing so.
>
> Foster father has a very playful attitude with the kids, and it is very evident that they have a good bond with him and look forward to him coming home from work so they can play.

Id. at 23. She further testified that, at her last visit with the Children on an unspecified date, "[B.L.] and [K.L.] . . . informed me that though they care deeply about their parents, the phone calls are becoming a burden to them. They stated that they have to miss fun activities for phone calls that sometimes don't happen." Id. at 25-26. Thus, the testimony of Ms. DiBenedtto and Ms. Frawley demonstrates that, during eighteen months in placement in their pre-adoptive home, K.L. and B.L. have adjusted to living in the home and have developed a bond with their foster parents. Further, K.L. and B.L. realize their need for adoption.

In addition, Dr. Rosenblum's interactional and individual evaluations of the Children, their biological parents, and their foster parents in September of 2017, further demonstrates that the Children have a "secure attachment" to their foster parents.[5]  He testified the Children have formed "a sense of identity within [their foster] family."  Id. at 107.  He opined that, after eighteen months, the Children's bond with their foster parents "is a stronger bond than in many cases."  Id. at 126.  He further testified that, "the older two girls did comment that they don't feel as connected to birth parents as they do to foster parents."  Id. at 102.  Dr. Rosenblum opined that K.L. and B.L. have a "residual attachment" to their biological parents, and that K.L.'s residual attachment is the stronger of the two.  Id. at 103, 107.  With respect to S.L., the youngest child, Dr. Rosenblum testified that she "didn't show much of an attachment at all to birth parents."  Id. at 108.

Dr. Rosenblum performed an individual evaluation of K.L. on September 6, 2017.  He testified as follows on direct examination.

> Q. What did [K.L.] tell you about her home life when she was living with her biological parents?
>
> A. She spoke about being exposed to both substance abuse and domestic violence in her family of origin.  She specifically mentioned how her father would have very severe outbursts of aggressive behavior.  He would start hitting her mom[.]  [H]e would start throwing things.  She mentioned that she had gotten [sic] hit by accident when her father threw things in the past.

_____

[5] Dr. Rosenblum defined "secure attachment," in part, as "a very active exchange of affection."  N.T., 10/10/17, at 90.

- 12 -

She also mentioned that he would smoke weed and regular cigarettes. Her comment was [Father and Mother] would fight and hurt us. In contrast, she spoke about feeling very safe and secure in her foster home.

N.T., 10/10/17, at 90-91. Dr. Rosenblum testified that he diagnosed K.L. with "unspecified trauma and stress[-]related disorder, and with an adjustment disorder with anxiety." Id. at 91. He explained, "there is no question in my opinion that some of the trauma that she experienced while living with her parents affected her self-esteem and her ability to feel good about herself." Id.

With respect to how she feels about Mother and Father, Dr. Rosenblum testified that K.L. "has come to realize that . . . she cannot rely on her biological parents because they don't visit and they don't keep their word. And, in contrast, she has a very safe, secure, and predictable relationship with her foster parents, and she knows that she can rely on them." Id. at 93. Importantly, he testified regarding K.L.'s preference regarding adoption, as follows.

Q. Did you talk to K.L. about adoption?

A. I did.

Q. What did she tell you?

A. She said . . . that she would like to be adopted and live with her current parents, her foster parents.

Id. at 93-94.

Dr. Rosenblum likewise diagnosed B.L. with an unspecified trauma and stress-related disorder, and an adjustment disorder with mixed disturbance of emotions and conduct. Id. at 95. However, Dr. Rosenblum testified that she is "not as anxious as her older sister, [K.L.], and she does tend to be somewhat spunkier and more confident. . . ." Id. He testified that B.L. told him as follows regarding her home life with her biological parents.

> She repeated some of the same comments, that it was dangerous there, that her dad kept throwing things at her. . . . She didn't feel that her parents could take care of her, her birth parents that is, and she also commented that they just don't visit her anymore.
>
> She said her new parents don't fight, but her old ones did, and she was scared, and she has now moved to a different house where it's really nice. She also seemed to be aware that she may get adopted and was viewing that in a positive manner.

Id. at 94-95.

While performing an interactional evaluation of the Children and their foster parents, Dr. Rosenblum observed "a very strong, loving relationship between them." Id. at 89. He explained as follows.

> There's no question that [the Children] are very securely attached to [the foster parents]. They refer to them as mommy and daddy. There was evidence of a lot of affection.
>
> . . .
>
> I observed foster parents to be very effective in providing nurturing, a lot of age-appropriate stimulation. As I said, there was a lot of affection and a very close rapport and strong connection, emotional connection between foster parents and the children.

Id. at 89-90. Dr. Rosenblum stated, "there are signs of healthy functioning on the part of all three girls." Id. at 112. He explained, "both of the girls that I interviewed individually, [K.L.] and [B.L.], . . . they have trust and confidence and want to remain in this home. This is again not to say that they don't love their birth parents, but the[ir] primary sense of trust and emotional dependency has transferred clearly from birth parents to foster parents. . . ." Id.

During his interactional evaluation of the Children with their biological parents, Dr. Rosenblum observed that K.L. and B.L. "really enjoyed spending time with birth parents." Id. at 97. He stated that they "were very eager for attention from [birth] parents." Id. at 96. With respect to S.L., then age three, he observed that she "seemed to be lost at times and did not receive nearly the same degree of attention from birth parents as her older two sisters did." Id. at 96.

It is important to note that Dr. Rosenblum opined that, if Mother's and Father's parental rights are terminated and K.L. and B.L. had no contact with them at all, they would suffer "a further sense of loss and trauma. . . ." Id. at 133. He still recommended terminating parental rights and freeing the Children for adoption, but he recommended allowing the Children to have continuing contact with Mother and Father. Id. at 113, 134, 141-144. He testified as follows.

Q. Do you believe the [C]hildren's relationship with their parents is so necessary and beneficial that this [c]ourt should not terminate their rights?

A. No, I would not be able to say that it is so necessary and sufficient. . . .

Id. at 136.

Finally, on cross-examination by Mother's counsel, Ms. DiBenedetto testified that the Children's foster mother "said that they would be willing to have post[-]adoption contact." Id. at 76. However, contrary to Mother's contention, there is no evidence in the record that the orphans' court terminated her parental rights "upon the hope or expectation" of post-adoption contact. Rather, the court found that "a significant bond and relationship . . . exist[s] between the [C]hildren and the foster parents in so much as [the Children] refer to them as mom and dad. Foster parents have provided in the last 18 months a secure, safe environment that [the Children] have longed for in terms of permanency. Trust and emotional dependency has transferred to the foster parents, which I think is key in determining this decision." Id. at 167. The record and the relevant case law clearly support these findings. Therefore, we conclude Mother's argument on appeal is without merit. Because we discern no abuse of discretion by the court, we affirm the orders involuntarily terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/9/2018